[Civ. No. 5327.   Fourth Dist.   May 28, 1956.]

CONSOLIDATED COPPERSTATE LINES (a Corporation), Plaintiff and Respondent, v. ISABELLE F. FRASHER as Executrix, etc., et al., Appellants; HATTIE HARM et al., Defendants and Respondents.

Leslie C. Gillen, John R. Golden, C. J. Goodell and James T. Barstow for Appellants.

Lawrence W. Young, Hill, Farrer & Burrill, Robert Nibley, Lopez & Hyde and Floyd H. Hyde for Respondents.

BARNARD, P. J.—This is an appeal from a judgment decreeing the specific performance of two contracts to sell personal property. The contracts were entered into on July 5, 1951, by the executors of the last will of Harold B. Frasher, deceased, and provided for the sale to the plaintiff of all the stock owned by the testator in three corporations and also of the testator's half interest in a partnership known as "Terminal Warehouse," the other half of which was owned by defendant Hattie Harm. These contracts were a part of a single transaction by which these executors and the Harms agreed to sell to the plaintiff practically the entire business being conducted by the corporations and the partnership. Three of the four executors later sought to avoid enforcement of the agreements and are appealing while the Harms, although named as defendants, have at all times sought enforcement of the agreements.

The three corporations, which will be referred to as the "Valley" corporations, were the outgrowth of a business started by Harold B. Frasher and George B. Harm. They became the principal stockholders of the three corporations and also the owners of the Terminal Warehouse business. Mr. Harm died first and Mr. Frasher died on February 23, 1949, leaving a will in which he authorized his executors to sell the property of his estate.

The Valley corporations and the Terminal Warehouse partnership are interrelated, being operated as one organization, and the sellers in this transaction represent all of the ownership therein except for 14.30 per cent of the stock of one of the corporations. Valley Motor Lines, Inc., operates as a common carrier in hauling freight on certain highways. Its stock was owned as follows: 32.35 per cent by Valley

Express Company, 34.22 per cent by the Frasher Estate, 19.13 per cent by the Harms, and 14.30 per cent by a few other stockholders who are not parties to this sale or to this litigation. Valley Express Company operates entirely within cities and towns, picking up freight to be hauled by Valley Motor Lines, Inc. All of the stock in Valley Express Company was owned by the Frasher Estate and the Harms. United Motor Transport Lines merely holds the legal title to certain property used by the other two corporations, and all of its stock is owned by Valley Motor Lines, Inc.

After the death of Mr. Frasher unsuccessful negotiations were carried on by the Frasher Estate with various motor truck companies for the sale of all of the estate's stock in the Valley corporations, and also its interest in Terminal Warehouse. In the spring of 1951, negotiations were begun by the plaintiff with the executors of the Frasher Estate and the Harms which resulted in the execution of three contracts on July 5, 1951. In the first of these contracts (Exhibit 1) the Frasher executors agreed to sell to the plaintiff all of the estate's stock in the Valley corporations for $518,353.15. In the second contract (Exhibit 2) the Harms agreed to sell to the plaintiff all of their stock in the Valley corporations for $300,659.65, on substantially the same terms. In the third contract (Exhibit 3) the Frasher executors and the Harms agreed to sell to the respondent the business and assets of Terminal Warehouse for $100,000. While only the first and third of these contracts are directly involved here, all three constitute in effect a single agreement to sell since by their terms if one fails for any reason all must fail. In summary, the Frasher Estate agreed to sell its interest in this business to the plaintiff for a total of $568,353.15; and the Harms agreed to sell their interest therein for a total of $350,659.65.

The Frasher agreement (Exhibit 1) provided that the purchase price was to be paid as follows: On the signing of that agreement $25,917.66 was to be delivered to the attorney for the sellers, to be held in escrow, one of the conditions being that it should be deposited in an interest-bearing account in a certain bank, the interest earned to eventually go with the principal. When title to the shares was transferred, on the closing date provided for in the agreement, the buyer was to pay another $113,533.39 which, with the original deposit, makes a down payment of $139,451.05 or 26.9 per cent of the entire purchase price. The balance of

the purchase price, $378,902.10, was to be paid in six equal annual instalments, the first instalment to be due on or before one year from the closing date; with 5 per cent interest on the deferred payments to be paid annually. It was further agreed that the buyer would execute and deliver to the executors a negotiable note for the balance of $378,902.10, payable on those terms and dated as of the closing date; the note to be secured by a pledge of the corporate stock executed at the closing date, in the form attached to the agreement. The buyer reserved the right to prepay any or all of said instalments at any time.

The Valley companies are subject to regulation by the Interstate Commerce Commission and the Public Utilities Commission, and the contract provided that it was subject to the conditions precedent that the transaction should be approved by those two Commissions, and by the probate court. In this connection it was agreed that it was the responsibility of the buyer to procure the approval of the two Commissions, and of the sellers to procure the approval of the probate court; and that both parties would cooperate fully to that end.

It was further provided that this transaction should be closed concurrently with the closing of the sales under the other two contracts (Exhibits 2 and 3); that the closing date should be the second Wednesday after all three of these approvals had been secured; and that "the order of the Court or of either Commission which last becomes final shall determine the closing date." It was also agreed that, in the event of a longer delay in the closing date, the buyer should pay the seller 5 per cent interest on the purchase price, beginning nine months after the date of the agreement and running to the closing date.

The executors agreed that pending the closing of the sale it would not cause or permit the corporations to make any changes in their corporate structure; to declare a dividend or make any payment in respect to their capital stock; to enter into any transaction other than in the ordinary course of business; to increase the rate of compensation of their officers or directors; or to default in the filing of any reports or returns due to any federal, state or municipal authority.

In accordance with the terms of the various contracts $50,917.66 was deposited with the seller's attorney when the agreements were executed on July 5, 1951. The buyer im-

mediately filed an application with the Interstate Commerce Commission for approval of the transaction. That proceeding was strongly contested by competing carriers, but approval was finally obtained on April 19, 1954. The approval of the Public Utilities Commission was finally obtained on August 18, 1954. In September, 1951, the executors filed a petition in the probate court seeking an order approving the agreements and authorizing the executors to complete the transaction in accordance therewith. Notice was given of the hearing at which the attorney for the executors appeared, and Isabelle F. Frasher testified on behalf of the executors. On October 5, 1951, the probate court made its order confirming and approving these sales in accordance with the terms set forth in the agreements, directing the executors to execute and deliver the necessary instruments of transfer "and to accept from the purchasers the purchase price in the form and in accordance with the terms and provisions of said (agreements)." No appeal was taken from that order and it became final.

When the contracts were signed in 1951 the Fresno terminal used by the Valley companies occupied most of a city block in Fresno. Thereafter, the State Division of Highways required a large part of this property for a new freeway, and the plaintiff consented in writing to the sale of this property to the state for $160,000 and to the purchase for $43,000 of a 9-acre parcel farther from town as a new terminal site. Later, a dispute over the erection of buildings and facilities on the new terminal site arose, which brought on this litigation. The Valley corporations were preparing to build in a certain manner, and the plaintiff took the position that if and when it acquired title to the stock it desired a somewhat different type of facilities.

The respondent filed this action on February 15, 1954. The complaint was for declaratory relief asking the court to construe the agreements of July 5, 1951, to instruct the parties as to their rights and duties thereunder, and to restrain the defendants from proceeding with the proposed building operations in the event it should be determined that they were not authorized to do so. The complaint alleged, among other things, that the defendants were about to let contracts for the construction of terminal buildings costing about $325,000; that the consummation of the transfer of the Valley companies to the plaintiff could reasonably be anticipated in the very near future; that the proposed con-

struction would be unsuitable for plaintiff's operation when the transaction was completed; and that said proposed construction was not a matter within the ordinary course of business. The defendant executors filed an answer alleging, among other things, that the approval of the Interstate Commerce Commission had not become final; that the construction of said terminal buildings was necessary in carrying on the business of the Valley corporations; and that "the construction of said terminal is an act within the ordinary course of business" under the provisions of said agreements. The prayer was for a decree construing said agreements, and declaring the rights and duties of the parties thereunder. The defendant corporations filed a separate answer, praying for a declaration as to whether or not the sale agreements were binding on the corporations; and that, in the event it be held that they were, the court construe the rights and duties of the parties.

After six days of trial in June, 1954, the court signed and filed an "order for interlocutory judgment" directing that the attorneys for plaintiff and for defendants Harm prepare findings and a proposed interlocutory judgment. It was further ordered that the findings should include, among other things specified, provisions to the effect that the agreements are valid and in full force and effect; that the plaintiff is entitled to performance thereof; that the court reserves jurisdiction to later determine other questions and to make such orders from time to time as may be necessary to the completion of said transaction; and that the plaintiff is entitled to a preliminary injunction restraining the defendants from expending any funds in constructing a terminal, except as ordered by the court upon stipulation of the parties or after a hearing.

In October, 1954, before findings were filed, the plaintiff moved for an order vacating the previous order of submission, reopening the cause and permitting the plaintiff to file a supplemental and amended complaint, which was presented therewith. After argument, the court granted this motion. This supplemental complaint alleged, among other things, that the Public Utilities Commission had on August 18, 1954, approved the transactions in question; that this was the last of the approvals required by the agreements; that the plaintiff had notified the defendants that it would be ready to close the transactions on September 1, 1954, the closing date

as fixed by the agreements, and had further offered to pay the full amount of the purchase price, with all interest, in lieu of giving a note and pledge covering a deferred balance; that none of the executors appeared at said time and place, as a result of which the transactions could not be consummated; that the defendants Harm and the defendant executor Crawford have expressed their willingness to complete the transaction; and that the other defendant executors have refused to do so. The prayer was for specific performance of the sale agreements, and that the defendants be ordered to consummate the transactions.

On December 1, 1954, a substitution of attorneys for the defendant executors was made. On the same day the defendant executors, other than Crawford, filed an answer to the supplemental complaint admitting that they had refused to consummate the transactions, and alleging that their refusal was based upon inadequacy of consideration and fraud in obtaining the agreements, the details of which would be pleaded in an amended answer later to be filed. The defendant corporations filed an answer on December 2 alleging that three of the executors had refused to consummate said agreements, and denying that a decree of specific performance is necessary or proper. On January 5, 1955, the defendant executors, other than Crawford, filed an amended answer alleging that the Public Utilities Commission's order of approval was not valid, since it was based upon a mistake of law and fact, in that it was stated therein that in an action pending in the Superior Court of Fresno County the court had held that these agreements are in full force and effect, whereas no findings or judgment had been entered in that action and the action was still pending. On April 1, 1955, the defendant executors, other than Crawford, filed another amended answer in which it was realleged that the approval of the Public Utilities Commission was based upon a misapprehension of law and fact, and further alleged that in filing the return of sale and petition for confirmation in September, 1951, the executors had stated that the sale was legally made and fairly conducted, that the price was fair and reasonable, and that it was for the best interest of the estate that the property be sold to relieve the estate of the hazards of operating such a commercial enterprise; that, in fact, those statements were not true; and that while the court had found these facts to be true in its order confirming the sale entered on October 5, 1951, the actual facts are that the

price was not fair or reasonable, that it was not for the best interest of the estate that such property be sold, and that the purported sale was not legally made or fairly conducted.

The cause again went to trial before the same judge on June 20, 1955, and on that date the attorneys for the defendant executors, other than Crawford, filed a brief raising for the first time the contention that the order of October 5, 1951, was a void order, since the petition for confirmation of the sale showed on its face "that 25% was not paid down as required by Section 773" of the Probate Code, and the court had no jurisdiction to confirm the sale. That trial lasted six days and on June 27, 1955, the court ordered judgment in favor of the plaintiff and that the plaintiff prepare findings.

The court found in all respects in favor of the plaintiff buyer. It was found, among other things, that on October 5, 1951, after proceedings regularly had the probate court made an order confirming the sale, and approving the transactions, in accordance with the terms set forth in the agreements (Exhibits 1 and 3); that the terms of the note and pledge provided for in the agreement were before the probate court at that time and were approved by the court; that the order confirming the sale as set forth in the agreements has become final, and is not void or voidable; that orders approving the transaction had also been made by the Interstate Commerce Commission and by the Public Utilities Commission; that of the three orders of approval required that of the Public Utilities Commission became final on August 18, 1954, and was the last to become final; that September 1, 1954, was the proper closing date for said transactions as defined by the agreements; that the selling prices provided for in the agreements were the fair market values of the properties as of July 5, 1951; that the agreements are fair, just and reasonable; that the defendant executors acknowledged that these agreements were just and reasonable, and the consideration fair and adequate, and none of them claimed any unfairness, unreasonableness or inadequacy of consideration until after the commencement of this action; that the terms of these agreements are sufficiently certain and definite to make the precise acts to be done by the buyer and sellers clearly ascertainable; that the plaintiff has fully performed and is ready, willing and able to perform all its obligations under the agreements; and that the plaintiff is entitled to have these agreements specifically performed. Judgment was

entered accordingly and the defendant executors, other than Crawford, and the defendant corporations, have appealed. The executors, other than Crawford, have also appealed from an order denying their motion to vacate the judgment and enter a different judgment on the findings.

The main contentions of the appellant executors are that they exceeded their authority in entering into these contracts since they did not provide for the payment of 25 per cent of the purchase price "in cash at the time of sale," as required by section 773 of the Probate Code; that for the same reason the probate court had no jurisdiction to entertain the proceedings for confirmation; that the order of October 5, 1951, confirming the sale was void and of no effect; and that contracts which violate statute law cannot be enforced in equity. It is argued that the order confirming the sale, being void, may be thus collaterally attacked; that the statutory requirement that at least 25 per cent of the purchase price must be paid "at the time of sale" means that this amount must be paid "when the agreement of sale is entered into or, at the latest, before the order of confirmation is made"; that this must be true since it is further provided that "the terms of said note and pledge" securing the balance are to be approved by the court at the time of confirmation, and the "balance" required to be secured by a note and pledge can only mean the amount remaining after not less than 25 per cent has been paid in cash; that the requirement for the court's approval of said note and pledge clearly "requires the court's approval of documents already *executed* when confirmation is made"; that the court could not approve the terms of the note here to be given because that note was to be dated as of the "closing date" which could not be known at the time of confirmation; that a contract which does not comply with statutory requirements cannot be held to be just and reasonable; that this violation of the statute was detrimental to the estate in that instead of having $139,451.05 and a note approved by the court, on October 5, 1951, it then had only a promise on paper for something at an indefinite date in the future; that further prejudice appears in that the estate would lose its share of any profits made by the corporations in the meantime; and that section 773 is unambiguous, and unequivocally requires that not less than 25 per cent of the purchase price be paid before the order of confirmation is made.

The main question presented is as to the intent and meaning of section 773 of the Probate Code. ■ The obvious purpose of that section is to permit the sale of personal property partially on credit, with security for the deferred balance, and with the court's approval of the terms of the security papers. So far as material here, all that this section requires is that 25 per cent of the purchase price shall be paid "at the time of sale"; that the executors "shall take" a note for the balance secured by a pledge of the property sold; and that the terms of the note and pledge are to be approved by the court "at the time of confirmation of sale." There are many meanings of the word "sale" in common use and, in accordance with the context, the word may refer to a completed sale or to an agreement of sale. ■ As we view section 773 it was intended to permit not only completed sales but agreements to sell where the "time of sale," at which the 25 per cent must be paid, is to be subsequent to the "time of confirmation," at which time the terms of the note and pledge which are to be taken for the "balance" must be approved by the court. If it had been intended that the words "at the time of sale" should refer to "the time of confirmation of sale" it would have been easy to so state, and this would probably have been done. The language used indicates that the time of sale may well be different from the time of confirmation; that the payment of 25 per cent and the taking of a note and pledge for the balance shall occur at the same time, which is the time of sale; and that the requirement for the approval of the terms of the note and pledge, rather than for the approval of the instruments themselves, was intended to permit the approval of an agreement to sell where the closing date or "time of sale" is to take place at some time after the order of confirmation is entered. The words "at the time of sale" may well mean the time at which title is delivered, especially under such circumstances as here appear. The requirement for taking a pledge of the property sold, as security, would indicate that title to the property was then being passed to the purchaser, and strongly implies that this is the "time of sale" mentioned in the preceding sentence. ■ The language used implies that the 25 per cent is to be paid at the time of sale, in the sense of a time when a binding sale can be and is being made, and title to the property can be transferred to the purchaser and a pledge given. This could not occur here until the sale was approved by the two regulatory

commissions. It would be unreasonable to require a buyer to pay 25 per cent of the purchase price before it could be known whether or not the sale could legally be made, or to pledge property at a time when title thereto had not been and could not be transferred to him. It would be equally unreasonable to construe this section as having been intended to have an effect which would absolutely prevent the sale of such property as is here in question, since the approval of the two commissions was required, and the obtaining of that approval would naturally require the prior approval of the probate court. As we view it, a sufficient compliance with section 773 here appears. As thus construed, the procedure thereunder is consistent with the other provisions of that code governing the sale of stock in corporations and sales of realty.

Whether or not the meaning of section 773 is as we have indicated, it does not clearly appear from the language used that the section unequivocally requires not less than 25 per cent of the consideration to be paid in cash before the order of confirmation is made. The most that could be said is that the language used is ambiguous with respect to what is meant by the words "at the time of sale." In that situation the court was called upon to construe the statute, in considering the application for confirmation of the sale. If it be assumed that the court misconstrued the section in making its order confirming the sale on October 5, 1951, this was an error in passing upon something within the court's jurisdiction and not an act in excess of jurisdiction. That order became final and could not be here collaterally attacked. (*Estate of Keet*, 15 Cal.2d 328 [100 P.2d 1045].) The order confirming the sale was not a void order, and this case does not come within the cited cases holding that a void order may be attacked at any time. In view of our holding in this respect, it is unnecessary to consider other points incidentally raised by these appellants, and the many cases cited in connection therewith. The plaintiff's pleadings were sufficient to state a cause of action for specific performance, and they cannot now be collaterally attacked. The contention that these contracts were not just and reasonable as to the appellants is not sustained by the record, and is sufficiently settled by the order confirming the sale. Moreover, the facts warrant the application of the principles of estoppel as against these appellants.

The appellant corporations raise the further point that the agreements in question are invalid, as contrary to public policy, and that the judgment, as it affects these corporations, should be reversed. It is argued that the executors signing the agreement as sellers were the directors, and all of the directors, of these corporations; that they violated their duties as directors by furthering their own interests in promoting a sale of their own shares without considering the best interest of the corporations; and that certain restrictions contained in the agreements relating to issuing stock, declaring dividends, increasing the compensation of officers of the corporation, and entering into transactions other than in the ordinary course of business, were calculated to interfere with the orderly conduct of business by the corporations and to impair their ability to fulfill their duty to the public under their franchises.

These corporations, as such, have no real interest in the controversy here involved, and are in no way affected or prejudiced by the judgment. The corporations were not parties to these agreements and in executing the agreements the executors were acting as such, and not as directors of the corporations. The provisions objected to were a part of a general provision requiring the sellers to make reasonable efforts to preserve the business of the corporations intact, including such matters as good will and not changing the manner of conducting the business. There is nothing to indicate that the controlling stockholders were not acting for what they considered to be the best interest of the corporations as a going business; and any possible illegality in this connection was not only severable but was a matter concerning which other means of relief could have been pursued if this was deemed necessary. It was understood and intended that the transaction could be closed within a few months, and the delay which occurred was caused by unforeseen conditions which delayed the obtaining of the required approvals by the respective commissions. The contracts involved no breach of duty to the public. The restriction on the payment of the dividends may be interpreted as applying to the signing stockholders only, and no minority stockholder has complained or is now complaining. Moreover, the record indicates that one of the corporations, Valley Motor Lines, Inc., had not paid a dividend since 1939. Assuming that the appellant corporations are appealing in good faith and

not merely in the interest of the appellant executors, we are pointed to no evidence indicating any harm or prejudice to the corporations as such, or to any minority stockholder. Incidentally, the order of the Interstate Commerce Commission approving the transaction required the plaintiff to purchase, within a limited time after the consummation of the sale, any outstanding stock of Valley Motor Lines, Inc., which might be offered for sale to it, and at the price per share called for by these agreements. The plaintiff has written to each such shareholder offering to so purchase such stock upon the consummation of the transaction, and 84.30 per cent of the minority interests have responded that they desired to sell. No reversible error appears in this connection.

The parties agree that by oversight the matter of interest was omitted from the portion of the judgment disposing of the $50,950.64 which was originally deposited in escrow with the seller's attorney. The judgment is modified by providing that subparagraph (5)(c) thereof shall be amended to read as follows:

"(c) The defendant executors shall be entitled to receive the sum of $30,917.66, together with interest earned thereon, and the defendants Harm, the sum of $20,032.98, together with interest earned thereon, from the initial deposit of $50,950.64 made by plaintiff at the time of execution of the said agreements, Exhibits 1, 2 and 3."

As so modified the judgment is affirmed, and the order is affirmed, the respondents to recover their costs.

Griffin, J., and Mussell, J., concurred.

A petition for a rehearing was denied June 19, 1956, and the petition of appellants Isabelle F. Frasher, as Executrix, etc., and Ernest E. Frasher and Morris A. Atkins, as Executors, etc., for a hearing by the Supreme Court was denied July 24, 1956.